# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| NOVASOM, INC., | : | Case No. 19-11734 (BLS) |
|  | : |  |
| Debtor. | : |  |

## DECLARATION OF GREGORY STOKES
## IN SUPPORT OF FIRST DAY MOTIONS

I, Gregory Stokes, declare that the following is true to the best of my knowledge, information and belief:

1. I am the chief executive officer of NovaSom, Inc. ("NovaSom" or the "Debtor") and, as such, am familiar with the Debtor's day to day operations and business and financial affairs.

2. As the Debtor's chief executive officer, I am responsible for overseeing all aspects of the Debtor's business, including finance, marketing, sales and the administration of the Debtor's Chapter 11 case.

3. I have been employed by the Debtor since July, 2013.

4. I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the Debtor's first day motions and applications filed contemporaneously herewith (collectively, the "First Day Motions"). I have reviewed the First Day Motions or have otherwise had their contents explained to me by the Debtor's proposed counsel, and I believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate in Chapter 11 with a minimum of disruption to its business or diminution in the value of its assets.

5. Except as otherwise indicated herein, all of the facts set forth herein are based on my personal knowledge or upon information provided by members of the Debtor's board of directors, management or professionals. If called as a witness, I would testify to the facts set forth in this declaration.

## BACKGROUND

6. On August 2, 2019 (the "Petition Date"), the Debtor filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtor continues to operate its business and manage its properties as a debtor-in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. NovaSom is a home sleep testing ("HST") company having its principal place of business in Glen Burnie, Maryland. Its business model is to send a medical device (FDA approved sleep recorder) to a patient's home in order for the patient to be tested for obstructive sleep apnea ("OSA") in his or her own home, rather than in a sleep lab, when a physician prescribes the HST based on symptoms and the patient's condition. The device records and auto-scores the number of apnea events, then sends the data back to NovaSom's servers via a cell phone chip in the device. Sleep physicians are then able to overscore the data and give an opinion to the ordering physician as to the patient's likelihood of having OSA.

8. NovaSom's first certificate of incorporation was filed with the Delaware Secretary of State in March, 2010. At that point, it effected a merger with a previously existing HST company called Sleep Solutions. From 2010 to 2012, NovaSom developed a new device ("AccuSom"), which enabled sleep data to be sent wirelessly, rather than requiring the return of the device to a lab in order to download the data. When that device launched, sales were not as robust as planned, and the management team was replaced in 2013 by a commercially oriented

team.  Between 2013 and 2017, orders for the AccuSom HSTs grew 500%.  However, the average sales price dropped by nearly 30% over that period of time due to market conditions and the general availability of HST providers.  Additionally, the cost of growing the sales was significant and included hiring more sales representatives, as well as support and customer service personnel to manage the orders.  As a result, NovaSom never reached profitability.

9. In early 2017, the NovaSom board of directors decided to see if the significant growth of the previous years would attract a buyer for the company.  An investment bank was engaged to begin a process to determine the extent of market interest.  The investment bank contacted 70 companies, but ultimately no viable indications of interest were received.  While the growth was impressive, most of these potential strategic buyers wanted to see a larger scale, along with continued growth.  They were also concerned about barriers to entry in the market, along with decreasing pricing going forward.  The message was that if we could continue to grow and elevate sales to a higher number, NovaSom would achieve significant value for shareholders over the next few years.  In early 2018, NovaSom entered into a debt agreement with a large commercial lender to enable operations to continue and spur growth.  NovaSom also continued to purchase its AccuSom devices through equipment leases that were paid over time, through various leasing companies.

10. In June of 2018, NovaSom engaged another investment bank to find possible private equity groups to provide the resources for continued growth.  This process resulted in a term sheet that was agreed to on August 13, 2018, and allowed the private equity group 45 days of exclusivity in which to conduct its diligence.  At the end of the exclusivity period, the private equity group came to the conclusion that it had overbid, and reduced its offer significantly.  The NovaSom board of directors decided that other private equity groups and structured lenders

would recognize more value in the company and agreed to continue to fund shortfalls in cash while management continued its efforts to raise money.

11. On November 29, 2018, NovaSom entered into a term sheet with a large life sciences structured debt provider which was to provide significant growth capital for the company. This term sheet gave the debt provider exclusivity for 60 days, ending on January 31, 2019. On January 18, 2019, 10 NovaSom sales personnel resigned at the same time and went to a competitive HST provider. This event, along with general market conditions, caused the debt provider to withdraw its term sheet during the last week of January, 2019.

12. On March 14, 2019, NovaSom agreed to a letter of intent for a strategic buyer to purchase all of its shares. This agreement had a 60-day exclusivity clause. During this period of time, the potential buyer was very concerned that sales continued to grow and the plans moving forward were for more sales personnel and a significant amount of marketing, so NovaSom continued to spend resources to try to grow the business. NovaSom's investors continued to fund cash shortfalls from reserves that had been set aside, but both of the funds that were supporting the business had very little left in reserve, and funding was generally on a month to month basis. After six weeks of exhaustive diligence, the potential buyer decided not to proceed and gave notice of that decision on April 24, 2019.

13. NovaSom's management reached out to a private equity firm that had been interested in the company in late 2018, and entered into another exclusive term sheet with that firm to acquire all of NovaSom's assets at a considerable discount to any offers previously considered on April 24, 2019. While this transaction was supposed to close in mid-June, 2019, this private equity firm decided that in order for it to make the investment in NovaSom, the senior secured lender would have to make adjustments to the debt facility in place, and allow the

buyer to invest money into NovaSom rather than paying down debt. The lender did not view this proposal as acceptable, and the private equity group informed NovaSom that it would only move forward with a purchase of NovaSom or its assets if NovaSom filed for protection under bankruptcy law or otherwise cleansed the company from the excessive liabilities incurred over the past several months trying to sustain growth.

14. At that point, with the market value of the company less than the amount of its liabilities, the current investors could no longer fund NovaSom's operations. In June, 2019, NovaSom retained Sherwood Partners at the request of the senior secured lender to help identify potential asset purchasers and determine the best path moving forward to protect its shareholders, creditors and employees.

15. During July, 2019, in consultation with the lender, NovaSom solicited and received an offer to acquire substantially all of its assets from VirtuOx, Inc. (the "Stalking Horse Purchaser"). That offer was conditioned, among other things, on the filing of a voluntary Chapter 11 petition and an expeditious sale process in which the acquired assets would be sold free and clear of liens, claims, encumbrances and interests pursuant to section 363(b) and (f) of the Bankruptcy Code.

16. NovaSom evaluated the offer of the Stalking Horse Purchaser in conjunction with the Lender and determined that proceeding with a sale of substantially all of its assets, subject to a process for obtaining potentially higher, better or competing offers, was in the best interest of NovaSom, its creditors, customers and employees in that, among other reasons, it would stem the Debtor's operating losses while preserving the continuity of the Debtor's customer services.

17. As of the Petition Date, the Debtor was indebted to the senior secured lender in the aggregate approximate amount of $10,000,000.00. The lender holds a lien on all of NovaSom's personal property, including inventory and accounts receivable.

**A.    First Day Motions.**

    (i)    Motion for Authority to Use Cash Collateral on an Interim and Final Basis (the "Cash Collateral Motion").

18. Concurrently herewith, NovaSom has filed the Cash Collateral Motion pursuant to section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b). NovaSom and the lender have entered into a cash collateral stipulation providing for the payment of the Debtor's post-petition payroll and other operating expenses through the anticipated date on which a closing of the sale of the Debtor's assets occurs.

19. NovaSom's access to cash proceeds and accounts receivable collections to fund its post-petition operations is critical to the Debtor's post-petition operations. The Debtor is requesting approval of the Cash Collateral Motion on an interim and final basis.

20. The Cash Collateral Motion includes a budget, which sets forth NovaSom's anticipated collections and disbursements for payroll and other operating expenses through September 27, 2019 and which has been fully negotiated with the lender.

21. I believe that the interim approval of the Cash Collateral Motion is in the best interest of NovaSom's estate and respectfully request the entry of an order granting such relief and scheduling a hearing to consider the relief requested therein on a final basis.

    (ii)    Motion for Interim and Final Orders: (I) Authorizing, But Not Requiring, Debtor to (A) Pay Prepetition Wages, Salaries, and Other Compensation and (B) Maintain Benefits Programs; and (II) Authorizing and Directing Banks to Honor All Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")

22. In the Wages and Benefits Motion, NovaSom seeks entry of an order (a) authorizing, but not requiring it to pay or cause to be paid, in its sole discretion, all or a portion of the amounts owing (and associated costs) under or related to wages, withholding tax obligations and employee benefits, (b) unless otherwise set forth in the Wages and Benefits Motion, authorizing, but not requiring, it to continue, in its sole discretion, NovaSom's plans, practices, programs and policies for current and former employees, as applicable, as those employee programs were in effect as of the Petition Date and as may be modified, terminated, amended or supplemented from time to time, in NovaSom's sole discretion and to make payments pursuant to the employee programs in the ordinary course of business.

23. If the requested relief is not granted, NovaSom's relationships with its employees would be adversely affected and there could well be irreparable harm to the employees' morale, dedication, confidence and cooperation during the Chapter 11 case. NovaSom's business hinges on its relationships with customers, and the ability to provide superior services is vital. The employees' support for NovaSom's efforts is critical to the success of this Chapter 11 case. At this early stage, NovaSom simply cannon risk the substantial damage to its business that would inevitably attend any decline in employee morale attributable to the Debtor's failure to pay wages, salaries, benefits and other similar items.

24. I believe that the relief requested in the Wages and Benefits Motion is in the best interests of NovaSom's estate, creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of NovaSom, I respectfully submit that the Wages and Benefits Motion should be granted.

      (iii)    Debtor's Motion for an Order Regarding Adequate Assurance of Payment for Utility Services (the "Utilities Motion")

25.    In the Utilities Motion, NovaSom seeks entry of an order (a) determining that the Debtor's proposed offer of deposits provide the Utility Providers listed in the Utilities Motion with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving procedures for resolving requests by Utility Providers for additional or different assurances beyond those set forth in the Motion, and (c) prohibiting the Utility Providers from altering, refusing or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance.

26.    NovaSom currently utilizes electric, cable, internet, telephone and other utility services in its operations provided by certain Utility Providers as described in grater detail in the Utilities Motion.

27.    Because the Utility Providers render essential services, any interruption in such services would prove devastating to NovaSom's ability to continue its operations. The temporary or permanent discontinuation of utility services at NovaSom's offices and related operations would severely restrict the Debtor's ability to continue operating an could cause irreparable harm. Uninterrupted utility services are essential to NovaSom's ongoing operations.

28.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, creditors and all other parties in interest in constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be granted.

29. I, the undersigned Chief Executive Officer of the above-referenced Debtor, declare under penalty of perjury that the foregoing is true and correct.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK. SIGNATURE PAGE TO FOLLOW.]

Dated: August 2, 2019

NOVASOM, INC.

*[signature]*

Gregory J. Stokes
President & CEO